In the Matter of HOWARD H. HALL, an Attorney, Respondent. NEW YORK STATE BAR ASSOCIATION, Petitioner.

Fourth Department, February 22, 1974.

*Frederick C. Stimmel (George B. Burke* of counsel), for petitioner.

*Howard H. Hall,* respondent in person, and *Hiscock, Cowie, Bruce, Lee & Mawhinney (Howard G. Munson* of counsel), for respondent.

*Per Curiam.* Respondent was admitted to practice as an attorney at law in this Department on March 9, 1960. Following complaints against him, the Onondaga County Bar Association conducted a preliminary investigation of his alleged professional misconduct, and by order of October 2, 1972 we transferred the matter to the New York State Bar Association. On or about June 1, 1973 the latter association filed a petition on notice to respondent, charging him with four acts or series of acts of professional misconduct, and respondent interposed a general denial thereof. The issues thus presented were heard before a Referee designated by us for that purpose, and he has filed his report sustaining the charges.

CHARGE I: *Denny* WRONGFUL DEATH ACTION.

On July 13, 1966 Mrs. Audrey Denny retained respondent with respect to her claim in negligence against Syracuse Transit Co. for the wrongful death of her husband earlier that month. Thereafter respondent conducted a personal investigation as to the facts of the accident. In January, 1967 respondent served a summons and complaint therefor upon Syracuse Transit Co.

and another, demanding $300,000 in damages. In May, 1967 the defendants in that action served upon respondent a demand for bill of particulars. Receiving no response to such demand, defendants moved for a preclusion order, and a 20-day preclusion order was granted on August 1, 1967 and served on respondent. Respondent made no motion to open or vacate the preclusion order. In February, 1968 he served a bill of particulars upon defendant, which was promptly returned, and respondent thereafter neglected the case. He never placed the case on the court calendar.

Mrs. Denny communicated with respondent on many occasions about the case and he invariably told her that everything was coming along fine and that the case would be reached for trial before 1970. He added that she would recover enough, at least, to take care of her two sons. He did not reveal to her that an order had been entered barring proof of matters requested in a demand for bill of particulars. In the summer of 1970, however, when Mrs. Denny inquired about the matter respondent told her that she did not have a case. She asked to take the file but he refused to surrender it to her. Before the Referee, respondent testified that there was no witness to the accident and that " all along " he had told plaintiff that she had no case.

The Referee found that Mrs. Denny's claim against the transit company had become barred by the Statute of Limitations through the negligence of respondent, and that respondent was guilty of professional misconduct in his handling of the case. We confirm those findings. Even if respondent's later assessment of the case were correct, he was delinquent in accepting it, suing it and permitting it to die. He deprived the plaintiff therein of the right to have her claim handled in a competent manner; and he deliberately misled her with respect to its progress. Respondent's inexcusable neglect to prosecute this personal injury action, thus permitting the action to be barred by the Statute of Limitations, constitutes misconduct which cannot be condoned. He violated canons 8, 15 and 29 of the Canons of Professional Ethics.

CHARGE II: *Savage* NEGLIGENCE ACTION.

On October 29, 1965 respondent was retained by Walter Savage with respect to his injury in an automobile accident which occurred that day. Respondent commenced an investigation and advised the insurance company for the prospective defendant that he represented Savage. A month later respond-

ent obtained a medical report as to the client's injuries and three months later he made a demand of $850 upon the prospective defendant's insurance carrier in an effort to settle the claim. Respondent asserts that he continued such efforts to obtain a settlement but without success. He did not institute suit on the claim, and he permitted the Statute of Limitations to run against it.

Respondent states that his client had a criminal record and so did not expect him to bring suit on the claim, and also that the client's medical bill was less than $100, showing that he was not seriously injured. Clearly, the client was unhappy by the failure of respondent to present the claim more effectively. The Referee found that respondent was negligent in his handling of this claim and was guilty of professional misconduct with respect thereto. We agree. He violated canons 8, 15 and 29 of the Canons of Professional Ethics.

CHARGE III: DEFENSE OF *Oley Allen.*

Petitioner charged that in defending one Oley Allen against an indictment for robbery and grand larceny in Onondaga County, committed on August 31, 1968, respondent attempted to impede and obstruct the District Attorney in his preparation for trial, to influence the testimony of Ida Weitz Crearis (Ida), the People's principal witness, and to nullify her danger as a witness against his client; and that he did so with knowledge that Ida, while under subpoena to appear in court on January 5, 1970, was being threatened, harasssed, intimidated and beaten by his client to change her testimony, and in fact that he took a sworn oral deposition from her contradicting her testimony before the Grand Jury which had resulted in the indictment against Allen. In addition, that respondent took said statement from Ida on the date set for trial of Allen and later that day when the District Attorney advised the court that he was having difficulty locating his principal witness (Ida) and believed that defendant was secreting her and attempting to influence her testimony, respondent failed to disclose to the District Attorney or the court that he knew where she was and had just taken a statement from her.

The evidence before the Referee shows that Oley Allen (Oley) was an outstanding football player for the University of Syracuse, expected by many to follow in the footsteps of Syracuse's all-time great players, Jim Brown and Ernie Davis. Ida was a Syracuse University student who came to know Oley and began to live with him. Before the crime was committed (Aug. 31,

1968) which underlies the charges against respondent, Oley had been charged with at least one other crime and respondent represented him. Respondent, therefore, knew Oley and came to know Ida before the commission of the crime by Oley on August 31, 1968.

When Oley was being charged by the police with the August 31, 1968 crime, he retained respondent to represent him. Respondent knew on November 14, 1968 that Ida had given to the police incriminating evidence against Oley and that Ida had been asked to testify before the Grand Jury which was considering charges against Oley with respect to the August 31, 1968 crime. Respondent advised Ida not to answer any question concerning that matter and to invoke the Fifth Amendment, and he wrote a letter to the District Attorney advising him that Ida would not answer such questions and would invoke the Fifth Amendment. Nevertheless, Ida did testify before the Grand Jury on November 15, 1968, stating that she was with Oley and another man on August 31, 1968 when they committed the crime of assault and battery, robbery and grand larceny which occurred that night at the DeWitt Colonial Motel near Syracuse, New York. The Grand Jury indicted Oley upon that testimony.

The case against Oley was set down for trial on January 5, 1970. On Tuesday, December 30, 1969 a subpoena was served on Ida to appear to testify at the trial on January 5, and this became known to respondent. Between December 30, 1969 and January 4, 1970 the prosecutor was in daily contact, personally or by telephone with Ida. On Saturday, January 3 Oley telephoned respondent and asked him to come to his home and take a statement from Ida in contradiction of her testimony before the Grand Jury incriminating Oley. Respondent went that day to the apartment at 123 Fountain Street in Syracuse, where Oley and Ida were living, taking a court reporter, Mr. Glavin, with him and sought to take her contradictory statement. However, Ida flatly refused to make such a statement, said that she would make her statement in court next week, and stated that she would stand by her testimony before the Grand Jury. At that time Ida appeared normal and was not wearing glasses. During the course of this visit to Ida with the court reporter, Oley and then respondent made several, but separate, trips with Ida into the bedroom to discuss the matter in the absence of the court reporter. These conferences lasted from three to five minutes each. Ida testified that when Oley was in the bedroom he hit her to compel her to give the statement that he

wanted. In the presence of the reporter Oley also pointed to a newspaper article reporting about a man getting 25 years' imprisonment for robbery, and he asked her if she wanted to send him to jail; and the court reporter testified that respondent supported Oley's question by repeating it to Ida; but she still refused to give the statement. Respondent reminded Ida that she should have invoked the Fifth Amendment before the Grand Jury. He said to Ida that if she wanted to tell the truth, now is the time. Ida replied, "By telling the truth I can't help Oley". She said, however, that she would like to help Oley, and respondent said, "Well, you know you aren't helping him now. You've got to make up your mind one way or another. If you are going to help him, okay; if you're not going to help him, okay. It's up to you". This was clearly an undisguised invitation to Ida to change her previous sworn statement to the Grand Jury, and constituted an attempt by respondent to impede and obstruct the prosecutor in the proof of his case by confronting him with her sworn statement in contradiction of her testimony before the Grand Jury. When it became apparent that Ida would make no contradictory statement, respondent and the reporter returned to the court house, where respondent suggested to the reporter that he say nothing about their trip to No. 123 Fountain Street that day.

There is evidence that Oley and Ida discussed committing a double suicide. At a time not apparent in the record Ida addressed an undated suicide letter to Oley. In the early morning of January 5, between 4:00 and 6:00 o'clock, Oley went to the cellar of their home and Ida followed him down. She later told inconsistent stories as to what happened. One version is that she tried to hang herself and that Oley cut her down, as a result of which she fell and hurt her face on the floor. She later testified that such story was untrue, that in fact Oley tried to hang her in the cellar and then he cut her down, after which she revived. On another occasion she testified that Oley strangled her into unconsciousness. Oley was later indicted for assaulting Ida with intent to cause her death, and he pled guilty to assault second degree. He also pled guilty to robbery third degree with respect to the August 31, 1968 crime, and on March 26, 1970 he was sentenced on each plea to an indeterminate term of seven years with a minimum of two and one-third years' imprisonment, to run concurrently.

At any rate, by 9:00 A.M. on January 5 Ida had agreed to give the contradictory statement which Oley desired, and indeed she wrote in longhand a two-page statement asserting that her

testimony to the Grand Jury on November 15, 1968 was false, given because of police threats and because of jealousy and a desire to hurt Oley who she learned had been with another girl the previous night. Ida or Oley telephoned respondent that morning and told him that Ida was ready to make a statement, and her handwritten statement was delivered to respondent. Respondent contacted another court reporter, Mr. Robinson, and at about noon that day they went out to an apartment, at 119 Fountain Street, a new location, to which Oley and Ida had gone from 123 Fountain Street.

Ida testified that in the early morning of that day, after she regained consciousness and Oley had washed the blood off her face, they went to a neighbor's apartment to sleep. She said, " I had asked him to phone for Mr. Hall (respondent) because I was scared. I didn't know, you know, what he would try to do, if he would try to do it again * * *. When I told him to get Mr. Hall he asked me if I was going to make a statement and I said I would; so then when Mr. Hall came * * * Mr. Hall * * * looked at me and he said, ' What's wrong? '. I said, ' He tried to kill me, get me out of here '. He told me to calm down. I said, ' Mr. Hall, I don't want to be alone with him; you know, because I am too scared. I don't know what he is going to do to me '. He said, ' Just take it easy; everything's going to be all right '; and then he asked me, ' You said you wanted to make a statement ', and I said, ' Yes, I'll make a statement ' ''. Mr. Hall conferred with Ida in the bedroom alone for a few minutes, and he and Oley both went back and forth from the kitchen to the bedroom a couple of times, and then Mr. Hall called the stenographer into the bedroom to take the statement.

When the stenographer entered the bedroom he observed that the window shade was drawn nearly all the way down and the room was quite dark, and without a chair. Ida sat on the left side of the bed (looking at it from the foot of the bed) and respondent sat near her. The stenographer sat on the end of the bed, and sat his stenotype machine on the floor at the foot of the bed. Respondent was nearer to Ida than was the stenographer. Ida was " crying or sobbing ". While respondent asked Ida if she wished to make a statement voluntarily and she replied that she did, the stenographer observed that Ida was wearing large dark sunglasses, that the left side of her face, exposed to him, seemed to be purple and very bruised and swollen as though she had been beaten. The stenographer swore Ida, and respondent began questioning her from her

previously handwritten statement, and the stenographer took her statement in which she contradicted her prior Grand Jury testimony.

The stenographer, Mr. Robinson, did not discuss Ida's condition with respondent, but upon his return to the court house he spoke to Mr. Glavin, the stenographer who had gone with respondent on Saturday, January 3 to take a statement which Ida had then refused to give, and Mr. Robinson asked him if he noticed anything wrong with Ida on Saturday, and Glavin said that he did not, that she was then all right. Robinson told Glavin that it appeared to him that Ida had been beaten up. Robinson transcribed Ida's statement of that day, and the next morning respondent's associate attorney, Mr. Pappas, came to get it. At that time Robinson said to Pappas, "Gee, what happened to her (Ida)? She was all black and blue and her eye was swollen." Pappas made no answer. Ida testified that when she gave the statement her left eye was black and blue and about closed and her right eye was bloodshot and that is why she wore the sunglasses; and that respondent had with him the handwritten statement which she had made earlier that day for Oley, contradicting her prior Grand Jury statement. She also testified that Oley said to respondent, "I think maybe Ida should see a doctor". Respondent testified that Ida was "upset" while giving her contradictory statement. He also told her that she looked bad and maybe should see a doctor.

On leaving, after obtaining Ida's statement, at her request respondent told Oley not to harm her; and despite respondent's knowledge that Ida was under subpoena to appear in court that day, he also said to Oley, "Don't let her leave." Ida did not appear in court in response to the subpoena that day. The prosecutor and his investigator went to No. 123 Fountain Street to get her but she was not there and they could not find her.

That night (January 5) Oley and Ida were driven by Pappas to a motel in DeWitt, a suburb of Syracuse, so that the police could not find them. The conclusion is inescapable that respondent deliberately and improperly attempted to manipulate Ida to deny the prosecutor vital evidence against Oley (see Drinker, Legal Ethics, pp. 77, 85–87).

After obtaining a statement from Ida on January 5 respondent went to court, arriving at 2:43 p.m. The District Attorney reported to the court that although the case was scheduled to proceed that day and he had subpoenaed his principal witness, Ida, he could not find her and was afraid that the defendant

was secreting her and he stated that, therefore, he was not ready and asked for a short adjournment. Respondent, knowing Ida's whereabouts and his instruction to Oley not to let her leave, objected to an adjournment and said that the case had been set down for trial on the 5th and he was ready, and he asked to have the trial proceed at once. Respondent did not advise the Judge presiding that he had just been with Ida, had taken a contradictory statement from her and knew where she was. He testified that "ethically" he did not think that he should have revealed that information without court direction. In response to the District Attorney's expression of fear that an effort was being made to influence Ida's testimony, respondent made an obtuse and misleading statement to the court that he did not know about the District Attorney's contacts with Ida and was not aware of any intimidation or anything of that sort, "and, certainly, Mr. Allen denies that". He strongly resisted the District Attorney's request for an adjournment.

The court is entitled to rely upon the accuracy of any statement of a relevant fact unequivocally made by an attorney in the course of a judicial proceeding (*Matter of Schildhaus,* 23 A D 2d 152). Respondent was aware of the whereabouts of Ida and should have communicated this information to the Judge, who would determine whether to issue a warrant to hold Ida as a material witness.

As above noted, that afternoon Oley and Ida were in respondent's office, and his associate, Mr. Pappas, drove them to a motel for the night and picked them up the next morning on the 6th and returned them to respondent's office, preparatory to going to court.

When respondent, with knowledge that Ida was with Mr. Pappas, appeared in court on the morning of January 6, he again objected to an adjournment and requested a dismissal of the case on the ground of the People's failure to proceed. He said to the court:

"MR. HALL: The case is marked for trial and has been marked ready yesterday, last week and December 15th. We are here prepared yesterday and today, under notice to proceed to trial today. We have been here yesterday, we are here today and our witnesses are subpoenaed. The case in itself is an old case. We have been told to proceed with it; we are here ready to go and the first knowledge I have that the case is not going was Mr. McMahon's statement right now. I feel that once we have been assigned to this part and ready to proceed to trial that we should be given that opportunity. * * *

"MR. HALL: For the record, Your Honor, I would like to move in the same motion as Mr. Ginnelly's, move to dismiss for failure to prosecute against my client.

"THE COURT: Denied."

The secretion of Ida when she was under subpoena, inducing her to make a later statement after she stated that her testimony before the Grand Jury was true, and respondent's lack of candor and fairness to the court are deplorable and suggestive that he was deeply implicated in violation of the Penal Law. By obtaining the contrary statement from Ida in these circumstances, respondent placed the burden on the prosecution to reconcile inconsistent testimony of the prosecution's principal witness, a defendant being safeguarded with the presumption of innocence. (See Judiciary Law, § 487; *People ex rel. Brown* v. *Tighe*, 146 App. Div. 491; *People* v. *Nicosia*, 164 Misc. 152; *People* v. *Oishei*, 20 Misc. 163.) And it is noteworthy that on January 5 and 6 when respondent moved the case for trial under the above circumstances, he knew that he had Ida's devastating statement contradicting her testimony before the Grand Jury.

The District Attorney got an order of arrest of Ida to protect her for the trial. On Tuesday the 6th she was delivered to the jail matron who arranged to have her examined by doctors and pictures were taken of her face and neck. The latter reveale that she had severe bruises thereon. The doctors gave the opinion that Ida had not been hung but had been hit and choked.

The Referee found the above facts and concluded that they demon ute that respondent engaged in unprofessional conduct. We agree. The evidence shows that respondent did attempt to impede the prosecution of Oley when, knowing of Ida's testimony before the Grand Jury and her adamant refusal of January 3, 1970 to recant, on January 5 he used her unsworn handwritten statement as a basis for securing a sworn recantation statement from her at a time when he knew that she was making it under extreme duress and against her will. Respondent participated with his client, Oley, in obtaining this statement under improper and shocking circumstances, with utter disregard for Ida's personal rights or interests and with the obvious purpose of destroying the prosecution's evidence and Ida's potential as a witness against his client. Having Ida's unsworn statement in hand, contradicting her Grand Jury testimony, he used it to obtain a detailed formal sworn statement before a court reporter so that she would not dare to testify at

Oley's trial without risking prosecution for perjury — and all done under her extreme duress. With respect to the charge of impeding the prosecution this has special significance in light of the fact that the identification of Oley at the scene of the crime by the victim was patently faulty. As the only other witness to the crime, Ida's testimony was crucial to the prosecution's case.

Respondent's above acts constituted unprofessional conduct and a violation of canons 15, 29 and 32 of the Canons of Professional Ethics (and see *Matter of Neuwirth*, 39 A D 2d 365, 368–369). In reaching this conclusion it is recognized, of course, that an attorney is not in any way chargeable with wrongful acts of his client in which the attorney does not participate.

CHARGE IV: THAT RESPONDENT FAILED TO CO-OPERATE WITH THE GRIEVANCE COMMITTEE OF THE ONONDAGA COUNTY BAR ASSOCIATION AND GAVE THEM MISLEADING AND INCONSISTENT STATEMENTS.

The record shows that on August 26, 1971 respondent testified before the Grievance Committee of the Onondaga County Bar Association and stated that the case of People v. Allen had not been scheduled to be tried beginning on January 5, 1970.

" Q. Now was Monday, January 5th, the day that the trial was scheduled to begin of Oley Allen?

" A. Absolutely not, and I'd like to make this very clear on the record. The trial was not scheduled for the 5th of January at all.   *   *   *

" Q. You weren't in the process, I take it, of preparing that case for trial?

" A. Absolutely not.

" Q. You didn't expect the case to be tried on January 5th?

" A. That is true ".

Later, on March 11, 1972, he testified before the committee that the case was so scheduled. On January 6, 1970 he had argued to the court for a dismissal on the ground that the case was scheduled to proceed the day before. The Referee found that his inconsistent statements before the committee were made with intent to deceive and mislead the committee; and we agree. This constituted unprofessional conduct and a violation of canons 15, 29 and 32 of the Canons of Professional Ethics.

It is scarcely necessary to add that respondent's wrongful acts struck at the very heart of our system of administration

476

of justice (*Matter of Dallal*, 31 A D 2d 442). The evidence establishes serious professional misconduct by respondent, a complete disinterest in his professional obligations, and a lack of candor and fairness with the court, designed to interfere with and impede the administration of justice.

Respondent has completely demonstrated his unfitness to continue as a member of the Bar and should be disbarred.

MARSH, P. J., WITMER, MOULE, SIMONS and GOLDMAN, JJ., concur.

Order of disbarment entered.